Defendant–Appellant: Michael VAUGHN,

v.

Plaintiffs–Appellees: The PEOPLE of the State of Colorado, ex rel. Harold D. SIMPSON, State Engineer for the State of Colorado, and James R. Hall, Division Engineer for Water Division 1.

No. 04SA381.

Supreme Court of Colorado, En Banc.

May 15, 2006.

Riske & Salisbury, P.C., Don W. Riske, Cheyenne, WY, for Defendant–Appellant.

John Suthers, Attorney General, Alexandra L. Davis, Assistant Attorney General, John J. Cyran, Assistant Attorney General, Denver, for Plaintiffs–Appellees.

Justice EID does not participate.

COATS, Justice.

Michael Vaughn appealed directly to this court from a judgment of the water court assessing a monetary penalty against him for diverting ground water contrary to a valid order of the division engineer. After ordering the discontinuance of any further diversions from Vaughn's well, the division engineer, along with the state engineer, brought an action in the name of the People against Vaughn, seeking injunctive relief and civil penalties authorized by statute for violation of such an order. The water court found a permanent injunction unnecessary but fined Vaughn $1,400 for unauthorized pumping and awarded the People costs, including attorney fees.

Because the People presented sufficient evidence to support the water court's finding that Vaughn diverted ground water within the meaning of section 37–92–503(6)(a), C.R.S. (2003), contrary to the division engineer's order, its judgment is affirmed.

I.

Pursuant to the authority granted them by section 37–92–503, C.R.S. (2003),[1] the state

1. The current version of this statute is identical to the 2003 version. While subsection § 37–92–503(8) was added effective May 1, 2003, the same subsection was repealed the following year effective April 7, 2004. Ch. 218, sec. 3, § 37–92–503, 2003 Colo. Sess. Laws 1509, 1511–12; Ch.

and division engineers brought an action in the Water Court for Water Division 1 against Michael Vaughn. The complaint alleged violations of the division engineer's order requiring Vaughn to discontinue diverting from a permitted well he owned, and it sought an injunction against further violations, civil penalties for past violations, and costs, including attorney fees. In October 2004, the matter was tried to the court.

In support of the state's theory that Vaughn or members of his family continued using the well to irrigate their 2003 alfalfa crop in violation of a valid order, it presented the testimony of the division engineer and a member of his staff; the water commissioner for the district; and a manager of an organization that supplies augmentation water for the out-of-priority use of its members' wells, called Groundwater Appropriators of the South Platte. The People presented direct evidence of the order and its posting, of notification by mail to the defendant, and of inspections indicating substantial use of the well after the order was posted; but the state's evidence of the particular persons who physically operated the well and of the specific use made of the water was all circumstantial.

Vaughn testified himself and was the only witness for the defense. He did not dispute, and in fact stipulated to, the validity of the order and compliance with statutory notice requirements, but he denied having any actual knowledge of the order or the continued use of his well. While he suggested other possible explanations for the pumping of the well, his theory of defense was simply that the statute imposes liability only upon the person who actually turns the well pump on. He argued to the court that the People failed to present any evidence that he did so personally, or even that a member of his family did so.

The water court ruled orally and several weeks later issued a written clarification. In its ruling, the court highlighted a number of its factual findings. Among them, the court

indicated that Vaughn owned the subject well and through the 2002 growing season used it to irrigate, with a pivotal irrigation system, a parcel of his land producing alfalfa. In early 2003, Groundwater Appropriators of the South Platte sent Vaughn a letter warning him that its water supplies might become unavailable because of changes in the legal situation in the South Platte River Basin. In March the division engineer notified Vaughn that an order to discontinue diverting would be issued and that violation of that order might result in penalties. Finally, the division engineer issued a legal and valid discontinuance order,[2] and on April 28, 2003, the water commissioner posted it on the power meter for the well, in accordance with statutory requirements.

During inspections conducted in July and November, the water commissioner discovered that the well was still being used, and from the power meter readings, engineers of the division calculated that approximately 6,239,000 gallons of water, more than 18 acre-feet, must have been pumped after the posting of the order to discontinue. If the well had been pumping 24 hours a day, this would have taken seven and a quarter full days. Power company records further indicated that significant amounts of pumping occurred in each of five monthly periods from the middle of May until the middle of October, and Vaughn paid each of the monthly utility bills within days.

The court found that the well was clearly being pumped in violation of the engineer's order. From circumstantial evidence it also found that Vaughn was actually aware of the order, and under these particular circumstances he could not have been unaware of pumping in violation of the order or what was happening to the six million gallons of water. In light of Vaughn's admission that he delegated the production of the alfalfa crop to his children and the irrigation of his fields to his father, in conjunction with the absence of any credible evidence of theft, or any diversion without his authorization, the

110, sec. 4, § 37–92–503, 2004 Colo. Sess. Laws 361, 362.

2. The order read, in part: "The owner/user of this well is ordered not to divert any water .... Use of this well is in violation of [Colorado statutes]."

court found that Vaughn or a family member must have pumped the water and that even if the latter were the case, Vaughn would be liable for violating the order according to a principal-agent theory.

Although it found that Vaughn's subsequent disabling of the well made a permanent injunction against continued violations unnecessary, the water court imposed the requested monetary penalty of $1,400. It also held Vaughn responsible for the costs of the proceedings, including the People's attorney fees, in accordance with the statute.[3] Vaughn appealed directly to this court, asserting that the unambiguous language of the statute imposes liability only on the individual who personally turns on a well pump in violation of an order not to do so; and in any event, the People failed to prove that either he or someone acting as his agent actually pumped the well.

## II.

■ Although not criminal in nature, the penalty authorized in section 37–92–503(6)(a), and imposed by the water court in this case, is entirely a creature of statute. Precisely what constitutes sanctionable conduct under this provision, and whether an owner or user of water rights can be vicariously liable for the conduct of others, are therefore matters of legislative intent. Within constitutional limitations, which have not been drawn into question here, the behavior subject to this civil penalty is determined by interpretation of the statutory provisions themselves.

Upon non-compliance with an order mandating partial or total discontinuance of any diversion, *see* § 37–92–502(1), (2), C.R.S. (2005), section 37–92–503, C.R.S. (2005), imposes a duty on the state and division engineers to apply for an injunction enjoining the person to whom the order was directed from further violations, and it makes clear an intent that contempt sanctions punish any vio-

lation of such an injunction. § 37–92–503(1), (4). In addition, subsection (6) mandates civil penalties for a range of conduct involving ground water and well operation. In particular, subsection (6)(a) provides that:

> Any person who diverts ground water contrary to a valid order of the state engineer or division engineer issued pursuant to section 37–92–502, in violation of a plan approved pursuant to rules and regulations adopted by the state engineer, or otherwise in violation of rules and regulations adopted by the state engineer to regulate or measure diversions of ground water shall forfeit and pay a sum not to exceed five hundred dollars for each day such violation continues.

Central to the defendant's assignment of error are the words, "[a]ny person who diverts." Although "person" and "divert" are both commonly used terms, they have particular significance for the acquisition and regulation of water rights in this jurisdiction and both are therefore specifically defined for purposes of the "Water Right Determination and Administration Act of 1969." Title 37, article 92, Colorado Revised States. Unless the context requires otherwise, when used in article 92 the term "person" refers not only to an individual, or natural person, but also to legal entities, both public and private, including partnerships, corporations, municipalities, the state, and even the nation. § 37–92–103(8), C.R.S. (2005).[4] The term "divert," refers to removing water from its natural course or location by means of some structure or device, like a well or pump. § 37–92–103(7), C.R.S. (2005).[5]

Defined this way, the words of subsection (6)(a) cannot be understood to restrict the imposition of liability to natural persons physically acting to pump the well, much less exclude any broader reading as unreasonable. When the term "person" is defined to include not only individuals but also public

---

3. The People submitted a bill of costs including over $38,000 in attorney fees.

4. " 'Person' means any individual, a partnership, a corporation, a municipality, the state of Colorado, the United States, or any other legal entity, public or private." § 37–92–103(8), C.R.S. (2005).

5. " 'Diversion' or 'divert' means removing water from its natural course or location, or controlling water in its natural course or location, by means of a ditch, canal, flume, reservoir, bypass, pipeline, conduit, well, pump, or other structure or device[.] ..." § 37–92–103(7), C.R.S. (2005).

and private entities, it designates some "persons" that are definitionally incapable of performing physical acts except through the conduct of representatives who are natural persons. Similarly, the term "divert" is statutorily defined in terms of the relocation of water by means of a structure or device, rather than acts, either exclusively or even typically, limited to human conduct. Nothing about the notion of bringing ground water to the surface of the earth by means of a well or other device suggests the physical act of turning an electric switch, as distinguished from ordering or authorizing the operation of a well by others; and if it did, consistent usage would at one and the same time preclude public and corporate entities from acquiring water rights by diverting and applying water to a beneficial use.

Far from requiring otherwise, the context in which the legislature has used these words makes clear that they must be given the same meaning as elsewhere throughout the Act. Section 37–92–503 is entitled "Enforcement" and provides for the enforcement of the state and division engineers' orders issued pursuant to the preceding section of this comprehensive statutory scheme. The engineers are charged with the administration, distribution, and regulation of the waters of the state. § 37–92–501(1), C.R.S. (2005). In furtherance of those duties, they are tasked with issuing orders to the owners and users of water rights to prevent waste or injury to other water rights having senior priorities. § 37–92–502(1), (2).

In addition to the injunctive relief prescribed elsewhere, subsection (6)(a) provides for civil penalties (in the form of fines paid to the state treasury) for each day of violation, to ensure compliance with such orders regarding ground water. § 37–92–503(6)(a). (Separate private actions for treble damages, by persons whose businesses or property are damaged, are permitted against any person who violates an order issued pursuant to section 37–92–502. § 37–92–504, C.R.S. (2005).) Along with surface rights, upon which they impact, rights to tributary ground water and the methods for acquiring them are highly regulated by both the water courts and the state and division engineers,

see § 37–92–102, C.R.S. (2005); and it is the owners and users of these ground water rights to whom discontinuance orders are authorized, § 37–92–502(1).

In light of the broader regulatory scheme of which subsection (6)(a) is a part, and the specific orders its civil penalties were designed to enforce, there would have been little point in giving the terms "person" and "divert" different or narrower meanings than they have throughout the scheme. *See Martinez v. People*, 69 P.3d 1029, 1031 (Colo. 2003) (all parts of comprehensive regulatory scheme should be given consistent effect). Apart from the sheer difficulty of discovering precisely when and by whom a well pump was actually turned on, *cf. United States v. Balint*, 258 U.S. 250, 254, 42 S.Ct. 301, 66 L.Ed. 604 (1922) (acknowledging problems of proof as legitimate factor in constructing regulatory measures to avoid social evils), such an impractical construction would be inconsistent with the primary purpose of the statutory scheme, to deter permitted wells from being used in violation of discontinuance orders and to the detriment of senior rights. *Cf. United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943) (construing the words "any person" under federal Food, Drug, and Cosmetic Act to impose vicarious liability where necessary to avoid eviscerating the statute of its purpose).

The context in which the terms "person" and "divert" are used here would therefore demand an interpretation including liability for the physical acts of others, even if they were not already statutorily defined in such broad language. To resolve the appeal before us, however, it is unnecessary to determine the full extent to which the legislature intended an owner or user's liability to be either vicarious or strict. In light of the water court's specific findings, it is enough that the statute imposes liability on an owner or user of water rights, to whom an order to discontinue was validly issued pursuant to section 37–92–502, whose well continues to be used with his authorization.

### III.

Although the water court made reference to a "principal-agent theory," it made no

attempt to characterize violation of the engineer's order as tortious conduct or to import concepts of vicarious liability developed for other purposes, in other contexts. It used the term solely to indicate that Vaughn would be vicariously liable for pumping by family members under the circumstances of this case. Because Vaughn admitted delegating the production of his alfalfa crop to his children and its irrigation to his father, and because the water court found, as a matter of fact, that the well was operated either by Vaughn in person or by an authorized member of his family, it rightly concluded that Vaughn was a person who diverted ground water within the meaning of the statute.

Furthermore, the People presented an abundance of evidence, although circumstantial in nature, from which the court could infer that Vaughn or an authorized member of his family pumped the well. That evidence consisted largely of testimony about the nature and location of the well, the sheer volume of water pumped through it, the likelihood that the water was used to irrigate Vaughn's alfalfa crop, and the improbability of it having been used for any other purpose without leaving signs that could go unnoticed by the witnesses.

In particular, the court heard evidence that Vaughn had authorized family members to irrigate and grow an alfalfa crop in previous years, up to and including 2002, and that the well was decreed and used for that purpose. Despite the engineer's order, the same fields produced another alfalfa crop in the 2003 season, with which Vaughn personally assisted. In addition, the more than six million gallons of water diverted through the well could not have been removed by fewer than 1100 trips of a tanker truck and would have filled the nearby detention pond to overflowing about 18 times, no signs of which were noticed by the water commissioner.

These circumstances, in conjunction with the court's determination based on independent evidence that Vaughn had actual knowledge of both the order and the continued use of his well, easily supported the court's inference that Vaughn knew what was being done with his water and yet did nothing to stop it.

Unless the court believed Vaughn's unsubstantiated testimony of ignorance and his suggestion of intruders, which the court openly rejected as incredible, virtually the only logical inference to be drawn from the circumstantial evidence before it was that Vaughn's well continued to be used for the irrigation of his fields, with either his authorization or his actual participation, or both.

## IV.

Because a ground water rights owner or user whose well is pumped with his authorization is a "person who diverts ground water" within the meaning of section 37–92–503(6)(a), and because the People presented sufficient evidence to support the water court's finding that Vaughn diverted ground water contrary to the division engineer's order, the judgment of the water court is affirmed.